# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAYSON-DIXON STRATEGIC CONSULTING, LLC | * |
| v. | *     Civil No. JKB-18-875 |
| MASON-DIXON POLLING & STRATEGIC CONSULTING, INC | * |

********

## MEMORANDUM

Plaintiff/counter-defendant Mayson-Dixon Strategic Consulting, LLC ("Mayson") brings this lawsuit against defendant/counter-claimant Mason-Dixon Polling & Strategic Consulting, Inc. ("Mason-Dixon") for alleged trademark infringement and unfair competition. Mason-Dixon counter-claims for alleged trademark infringement, unfair competition, and cyberpiracy. Now pending is Mason-Dixon's motion for a preliminary injunction (ECF No. 12). A hearing was held on August 28, 2018. For the reasons below, Mason-Dixon's motion is granted.

## BACKGROUND

This dispute concerns plaintiff Mayson's and defendant Mason-Dixon's confusingly similar putative service marks. Mayson, a political consulting limited liability company based in Maryland, uses "Mayson-Dixon Strategic Consulting, LLC" as its trade name and "MAYSON-DIXON" as its putative service mark. ECF No. 5, ¶ 1. Mayson was founded in 2015. *Id.* at ¶ 6. Mason-Dixon, a political polling and consulting company headquartered in Florida, uses "Mason-Dixon Polling & Strategic Consulting, Inc." as its trade name and owns the service mark "MASON-DIXON." ECF No. 12-2, Coker Decl. ¶ 3. Mason-Dixon was incorporated in 1985 in Maryland, and its most recent registration of the "MASON-DIXON" Mark was obtained in 2018. *Id.* at ¶¶ 2, 31. While the parties agree that their service marks are confusingly similar,

1

they disagree as to which party has superior rights to use the mark. ECF No. 5, ¶ 52; ECF No. 12-1, p. 9.

## I. History of Mason-Dixon Polling & Strategic Consulting, Inc. ("Mason-Dixon")

Mason-Dixon was incorporated in Maryland in 1985. ECF No. 12-2, Coker Decl. ¶ 3. The corporation has undergone a number of legal name changes, but has remained in continuous operation and has been owned and controlled by James Bradford Coker III ("Coker") since its incorporation. *Id.* Mason-Dixon offers public policy and political polling research and consulting services. *Id.* at ¶¶ 4-5. The polling services have been offered under the MASON-DIXON Mark since 1983, and the consulting services have been offered under the Mark since 1992. *Id.*

In 1992, Mason-Dixon's name changed from "Mason-Dixon Opinion Research, Inc." to "Political/Media Research, Inc." ("PMR"). *Id.* at ¶ 11. The company's registered trade name was "Mason-Dixon Political/Media Research," and it continued using the MASON-DIXON Mark. *Id.*

In 1993, Coker formed a spin-off company named "Mason-Dixon Campaign Polling & Strategy, LLC" to take over the political polling and consulting aspects of the original company. *Id.* at ¶ 12. During the time period in which the new company operated, PMR focused its operations on media polling. The new company was permitted to use the MASON-DIXON Mark. *Id.* It operated from 1993 through 1998, providing "polling, direct mail, television production, advertising buys, grassroots organizing, campaign management, and campaign consulting" under the MASON-DIXON Mark. *Id.* at ¶ 14. During Mason-Dixon Campaign Polling & Strategy, LLC's entire existence, Coker was its majority shareholder and controlling

owner. ECF No. 18-1, Coker Decl. (Reply) ¶ 2. The company ceased operations in 1998 and formally dissolved in 2000. *Id.* at ¶¶ 2, 7.

After Mason-Dixon Campaign Polling & Strategy, LLC ceased operations, PMR continued to provide services to Maryland political campaigns using the MASON-DIXON Mark. *Id.* at ¶ 7. Its clients included Martin O'Malley's 1999 Baltimore Mayor campaign, Obie Patterson's 2006 Maryland House of Delegates campaign, and Marc Elrich's 2014 Montgomery County Council campaign. *Id.* PMR undisputedly used the MASON-DIXON Mark in connection with its polling services. It also used the Mark in connection with its consulting services. ECF No. 12-2, Coker Decl. ¶ 21. For example, the Mark was used in 2014 in connection with a public policy consulting project for the Chesapeake Bay Foundation and in 2017 in connection with developing press releases regarding the Maryland governor's race. *Id.* at ¶ 23.

In March 2018, PMR changed its name to its current name, "Mason-Dixon Polling & Strategic Consulting, Inc." ECF No. 5, ¶ 42. Mason-Dixon continues to use the MASON-DIXON Mark in connection with polling and consulting.

## II. History of MASON-DIXON Mark

The MASON-DIXON Mark has been used continuously by Mason-Dixon since 1983 in connection with its polling and consulting work. Since 1992, the Mark has been publicized nationally in connection with Mason-Dixon's polling and consulting services. ECF No. 12-2, Coker Decl. ¶ 10. Mason-Dixon first filed to register the Mark on June 20, 2002. ECF No. 12-12. The registration was obtained on August 5, 2005 and remained effective through February 5, 2016. *Id.* The registration included Mason-Dixon's statement that the Mark had been used in connection with "conducting public opinion poll surveys for political purposes" and "political

consultation services." *Id.* The U.S. Patent and Trademark Office (the "PTO") cancelled the registration effective February 5, 2016 because Mason-Dixon neglected to file its Application for Renewal and Declaration of Use. Despite the cancellation, Mason-Dixon continued to use the MASON-DIXON Mark.

On July 12, 2017, Mason-Dixon again applied to register the MASON-DIXON Mark. ECF No. 12-11. The registration was obtained on February 6, 2018 in connection with the services of "conducting public opinion polls for political purposes and political consultancy." *Id.* The registration contains Mason-Dixon's statement that the Mark has been used in connection with these services in interstate commerce since at least June 1, 1984. *Id.* This registration remains effective through the date of this Memorandum.

### III. History of Mayson-Dixon Strategic Consulting, LLC ("Mayson")

Mayson was founded by Maryland residents Jayson Williams and Matthew Newcomer in September 2015.[1] ECF No. 5, ¶ 7. It operates in the field of "strategic political consulting, including advertising and direct mail, business development, nonprofit development, marketing and communications, fundraising, and public affairs," and its operations exclusively take place in Maryland. *Id.* at ¶ 6. Mayson claims it owns common law rights in the mark "MAYSON-DIXON" for political consultancy services, alleging it was the first in time to use this mark in commerce to advertise these services. *Id.* at ¶ 59. According to Mayson, Mason-Dixon has not provided political consultancy services in at least 20 years. Mayson claims that Mason-Dixon "intentionally positioned itself for the instant conflict" by changing its corporate name and re-registering the MASON-DIXON Mark. ECF No. 15-1, p. 16. Mayson raises two central

---

[1] Mayson offers a curious explanation for the creation of its name, claiming it is a blend of the names of Mayson's two founders and references that both founders grew up near the Mason-Dixon line.

4

arguments to support its claim of superior rights to the mark: (1) Mason-Dixon's registration of the MASON-DIXON Mark is void because Mason-Dixon made fraudulent misstatements on its application, and (2) Mason-Dixon abandoned use of the MASON-DIXON Mark for political consulting. ECF No. 5; ECF No. 15-1.

**IV. Procedural History**

Mason-Dixon learned of Mayson's operations in June 2017. ECF No. 12-2, Coker Decl. ¶ 33. At that time, Mason-Dixon took affirmative steps to ensure its rights, including re-registering its MASON-DIXON trademark. *Id.* After receiving its new registration, counsel for Mason-Dixon sent a cease and desist letter to Mayson. *Id.* at ¶ 36. The letter was followed by an unsuccessful phone conversation between counsel for the parties. *Id.* at ¶ 37.

On March 26, 2018, Mayson filed suit in this Court. ECF No. 1. The Amended Complaint contains four counts against Mason-Dixon: (I) declaratory judgment of non-infringement of trademark, (II) declaratory judgment of common law trademark infringement, (III) cancellation of Registration No. 5,395,587, and (IV) federal trademark infringement and unfair competition. ECF No. 5. On May 8, 2018, Mason-Dixon responded with its answer (ECF No. 8), a counter-claim against Mayson (ECF No. 10), a third-party complaint against Jayson Williams (ECF No. 11),[2] and the pending motion for preliminary injunction (ECF No. 12). The counter-claim alleges four counts against Mayson: (I) service mark infringement in violation of 15 U.S.C. § 1114(1)(a), (II) unfair competition in violation of 15 U.S.C. §1125(a), (III) service mark infringement & unfair competition under Maryland common law, and (IV) cyberpiracy in violation of 15 U.S.C. § 1125(d). ECF No. 10. A hearing on the preliminary injunction motion was held on August 28, 2018.

---

[2] The third-party complaint against Jayson Williams alleges cyberpiracy, but that claim is not relevant to the motion for preliminary injunction. ECF No. 11.

**STANDARD**

"A preliminary injunction is an extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Deciding whether to issue a preliminary injunction is within "the sound discretion of the trial court." *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 547 F. Supp. 2d 491, 502 (D. Md. 2008) (citing Fed. R. Civ. P. 65; *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)). To receive a preliminary injunction, the movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *WV Ass'n of Club Owners and Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

**ANALYSIS**

Mason-Dixon moves to enjoin Mayson from "continued use of 'Mayson-Dixon Strategic Consulting, LLC,' MAYSON-DIXON, or any words, marks, trade names, corporate names, or domain names that are confusingly similar to MASON-DIXON, or from otherwise engaging in unfair competition against Mason-Dixon, pending the final outcome of this action." ECF No. 12, p. 1. For the following reasons, the preliminary injunction is granted.

**I. Success on the Merits**

Mason-Dixon must show it is likely to succeed on the merits of Counts I, II, and III of its Counterclaim: (I) service mark infringement in violation of 15 U.S.C. § 1114(1)(a), (II) unfair competition in violation of 15 U.S.C. § 1125(a), and (III) service mark infringement and unfair competition under Maryland common law.[3]

**a. Trademark Infringement Claim**

---

[3] Mason-Dixon's Counterclaim also included a cyperpiracy claim (Count IV), but Mason-Dixon has not requested a preliminary injunction in connection with Count IV.

6

Establishing trademark infringement requires the plaintiff show:

(1) that it owns a valid mark;
(2) that the defendant used the mark 'in commerce' and without plaintiff's authorization;
(3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and
(4) that the defendant's use of the mark is likely to confuse consumers.

*Rosetta Stone Ltd v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012).

### i. Ownership of Valid Mark

Registration of a trademark is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce or in connection with the goods and services specified in the certificate." 15 U.S.C. § 1057(b). Where a trademark is unregistered, common law grants ownership rights, such as the exclusive right to use the mark, to the first party "to actually use the mark in the sale of goods or services." *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 267 (4th Cir. 2003) (citations and internal quotation marks omitted). Where two or more parties claim the right to use an unregistered trademark, "priority is determined by the first actual use of [the] mark in a genuine commercial transaction." *Id.* (alteration in original) (citations and internal quotation marks omitted).

Under 15 U.S.C. § 1115, there are multiple defenses to contest the ownership and validity of a trademark. 15 U.S.C. § 1115(b). One such defense is fraud in obtaining the registration or in obtaining the right to use the mark. 15 U.S.C. § 1115(b)(1). To show a trademark was obtained fraudulently, the defending party must show "the applicant or registrant knowingly [made] a false, material representation with the intent to deceive the PTO." *Military Order of Purple Heart Serv. Found., Inc. v. Others First, Inc.*, No. GLR-12-1483, 2012 WL 6761816, at *2 (D. Md. Dec. 28, 2012) (quoting *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009)).

Another defense is abandonment of the mark. 15 U.S.C. § 1115(b)(2). A mark is deemed to be abandoned if either "(1) its use has been discontinued with intent not to resume such use" or "(2) when any course of conduct of the owner...causes the mark to become the generic name for the goods or services." 15 U.S.C. § 1127.

MASON-DIXON is a valid mark owned by Mason-Dixon. Mason-Dixon obtained registration of the MASON-DIXON Mark in 2018, providing prima facie evidence of ownership and validity. *See* 15 U.S.C. § 1115(b). Even without the registration, Mason-Dixon has common law ownership rights over the Mark because it has used the Mark continuously throughout the United States in connection with its polling and consulting services since 1983, decades before Mayson was formed. Mason-Dixon's status as the senior user of the MASON-DIXON Mark gives Mason-Dixon the common law ownership right of exclusive use of the Mark, even though registration of the Mark was not obtained until after Mayson began its operations. *See Emergency One, Inc.*, 332 F.3d at 267.

Mayson fails to put forth a successful defense to Mason-Dixon's ownership of the Mark. First, Mayson claims the registration was obtained fraudulently because (1) Mason-Dixon misrepresented on its application the date of first use of the Mark in connection with its political consultancy services, and (2) Mason-Dixon falsely stated to the PTO that no one else had the right to use the Mark. Neither allegation is true. On its registration application, Mason-Dixon listed the date of first use of the Mark in connection with the services of "conducting public opinion polls...and political consultancy" as June 1, 1984. ECF No. 12-11. Mayson does not dispute that the Mark was used as early as this date in connection with polling, but contends the date of first use of the Mark in connection with consulting occurred after 1984. Even if Mayson is correct, there is still no fraud. Mason-Dixon was only required to provide the date of first use

8

for one of the services specified in the class of services. *See* 37 C.F.R. § 2.34(a)(v) ("If the application specifies more than one item of goods or services in a class, the dates of use...are required for only one item of goods or services specified in that class."). Accordingly, Mason-Dixon accurately stated the date of first use as required by federal regulations.

Mason-Dixon also declared on its registration application that "no other persons...have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive." ECF No. 5-1, p. 6. At the time it made this declaration, Mason-Dixon knew that Mayson was using a very similar mark in connection with political consulting services. Signing this declaration, however, did not constitute fraud. "Regardless of any knowledge an applicant may have had of another's use, if an applicant believes that it was the owner of the mark sought to be registered at the time it made application for registration, no fraudulent intent can be inferred from statements made in the application declaration." *Daniel J. Quirk, Inc. v. Village Car Co.*, 120 U.S.P.Q.2d 1146, 2016 WL 6136609, at * 8 (T.T.A.B. Sept. 27, 2016) (citation omitted). Because Mason-Dixon believed it was the owner of the Mark, this Court cannot infer fraud from the application declaration, even though Mason-Dixon knew of Mayson's use of a similar mark. Thus, no fraud was used to obtain the registration.

Second, Mayson contends Mason-Dixon abandoned the Mark when Mason-Dixon allowed the Mark to be used by "Mason-Dixon Campaign Polling & Strategy, LLC," the spin-off company founded by Coker that operated from 1993 to 1998. Mason-Dixon and Mason-Dixon Campaign Polling & Strategy, LLC, however, were related companies under trademark law because both companies were owned and controlled by Coker. ECF No. 18-1, Coker Decl.

(Reply) ¶ 2; *see* 15 U.S.C. § 1127 ("'[R]elated company' means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."). Mason-Dixon licensed the use of the MASON-DIXON Mark to Mason-Dixon Campaign Polling & Strategy, LLC. ECF No. 12-2, Coker Decl. ¶ 12. The authorized use of a Mark by a related company does not constitute abandonment of the Mark; instead, such use "inure[s] to the benefit of the registrant…, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public." 15 U.S.C. § 1055.

Mason-Dixon also did not abandon the Mark after the dissolution of Mason-Dixon Campaign Polling & Strategy, LLC because Mason-Dixon has continued to use the Mark since that time in connection with both polling and consulting. *See e.g.* ECF No. 18-6, Wayne Brandt Decl. ¶ 3 (MASON-DIXON Mark used in 2012 to provide polling and consulting services to Minnesota Forest Industries); ECF No. 18-10, James Campi Decl. ¶¶ 3-4 (MASON-DIXON Mark used in 2009 and 2011 to provide polling and consulting services to the Civil War Trust). Accordingly, because Mason-Dixon's ownership is established both at common law and by its registration and because it never abandoned the Mark, Mason-Dixon is the owner of the valid MASON-DIXON Mark.

### ii. Use of Mark in Commerce & Without Authorization

It is undisputed that Mayson used a nearly identical mark in commerce and without authorization.

### iii. Use of Mark In Connection with Sale, Offering for Sale, Distribution, or Advertising of Goods and Services

It is also undisputed that Mayson used its nearly identical mark in connection with the offering of services.

### iv. Likelihood of Confusion

Courts consider nine factors to determine whether use of a mark is likely to confuse consumers:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;
> (2) the similarity of the two marks to consumers;
> (3) the similarity of the goods and services that the marks identify;
> (4) the similarity of the facilities used by markholders;
> (5) the similarity of advertising used by the markholders;
> (6) the defendant's intent;
> (7) actual confusion;
> (8) the quality of the defendant's product; and
> (9) the sophistication of the consuming public.

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017) (citation and internal quotation marks omitted). Not every factor is applicable to every trademark dispute, "and there is no need for each factor to support [the plaintiff's] position on the likelihood of confusion issue." *Id.* (alteration in original) (citation and internal quotation marks omitted).

### (1) Strength of the Mark

"Strength consists of both conceptual strength and commercial strength." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009). Four categories of distinctiveness inform a mark's conceptual strength: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *Id.* at 393-94 (citation omitted).

The registration of the MASON-DIXON Mark is *prima facie* evidence that the Mark is not generic. *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 329 (D. Md. 2017) (citing 15 U.S.C. § 1115(a)). Instead, the Mark falls within the fourth category, arbitrary or fanciful, because there is no connection between the term "Mason-Dixon" and the nature of the

11

services offered by Mason-Dixon. *See George & Co. LLC*, 575 F.3d at 394. The term "do[es] not suggest or describe any quality, ingredient, or characteristic" of Mason-Dixon's services, making the Mark "inherently distinctive." *Id.* at 394.

In addition to possessing conceptual strength, the MASON-DIXON Mark is commercially strong. The concept of commercial strength is similar to the concept of "secondary meaning," which is relevant to determining a mark's validity. *Id.* at 395. Six factors are useful in evaluating a mark's commercial strength: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the plaintiff's use of the mark." *Id.* (citation omitted). For decades, the Mark has been used extensively, and until 2015, exclusively, throughout the country. ECF No. 12-2, Coker Decl. ¶ 10. Throughout its use, it has received media attention regularly and has become very well-known "as a reliable indicator of source for independent polling and consulting services." *Id.* Such use and success demonstrate the Mark's commercial strength.

### (2) Similarity of Marks

The similarity of marks is based on the similarity "in sight, sound, and meaning which would result in confusion." *George & Co. LLC*, 575 F.3d at 396 (citation omitted). The MASON-DIXON Mark and Mayson's competing MAYSON-DIXON Mark are nearly identical. In sight, they differ by only one letter. In sound and meaning, there are no appreciable differences. In fact, Mayson-Dixon admits in its Amended Complaint that the marks are confusingly similar. ECF No. 5, ¶ 52.

### (3) Similarity of Goods and Services

Both companies use their marks to identify the identical service of political consulting. ECF No. 12-2, Coker Decl. ¶¶ 4-5; ECF No. 5, ¶ 6.

### (4) Similarity of Facilities

The companies use similar types of facilities to offer their services: face-to-face meetings, phone calls, emails, and the Internet. ECF No. 12-1, p. 30; ECF No. 15-1, p. 26. The similarities between their websites are further addressed under the fifth factor.

### (5) Similarity of Advertising

Mason-Dixon and Mayson both advertise via internet, and their domain names are highly similar, differentiated by only two characters: <mason-dixon.com> and <maysondixon.com>. Accordingly, the parties use the same media to advertise, and their advertising covers the same geographical area. *See Pro-Concepts, LLC v. Resh*, No. 2:12cv573, 2013 WL 5741542, at *10 (E.D. Va. Oct. 22, 2013) (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984)) ("[I]t appears that both parties are using the same advertising media (the Internet) and, based on the widespread availability of the internet, that a large number of consumers will encounter advertisements for both.").

### (6) Defendant's Intent

"If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984). Although there is no direct evidence of Mayson's intent in adopting the MAYSON-DIXON mark, Mason-Dixon's 2005 trademark registration was effective for both polling and consulting services when Mayson began operating in 2015. ECF No. 12-12. Mayson disregarded Mason-Dixon's trademark registration by commencing operations under an almost identical service mark for identical services, evidencing Mayson's intent to confuse the public.

13

### (7) Actual Confusion

"Actual confusion can be demonstrated by both anecdotal and survey evidence. Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." *George & Co. LLC*, 575 F.3d at 398 (citations and internal quotation marks omitted). Mason-Dixon offers evidence of only two instances of actual confusion. ECF No. 12-2, Coker Decl. ¶¶ 33, 44; ECF No. 12-27. Because this number is so small, these instances may be dismissed as *de minimis*.

### (8) Quality of Defendant's Product

This factor "applies in 'situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods.'" *George & Co. LLC*, 575 F.3d at 399 (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996)). Because there are no goods involved here, this factor is not directly relevant. It is notable, however, that Mayson is a partisan political consulting firm servicing Democratic candidates, while Mason-Dixon is an independent, non-partisan firm. ECF No. 12-15; ECF No. 12-2, Coker Decl. ¶ 39. The partisan nature of Mayson's services could affect the reputation of Mason-Dixon's services.

### (9) Sophistication of Consuming Public

The clients of Mason-Dixon and Mayson are mostly sophisticated entities and individuals, including news agencies, trade associations, and political candidates. These clients are less likely to be confused by the similarities between the service marks at issue. Mason-Dixon's work, however, is also disseminated to the general public, so the consumers of work associated with the MASON-DIXON Mark are not all sophisticated and are more likely to be confused by the parties' nearly identical service marks.

In totality, the factors weigh decidedly in favor of Mason-Dixon. Most striking to this Court are that the service marks and trade names at issue are virtually identical, set apart by only one silent consonant, and that the companies operate in almost the same sphere. In this specific factual scenario, the analysis of these two factors overshadows the analysis of the other factors, strongly outweighing the lack of evidence of actual confusion. Many of the other factors also support the conclusion that there is a likelihood of confusion: the MASON-DIXON Mark is strong and distinctive, the parties use the same media, and there is evidence that Mayson intended to confuse the public by adopting the MAYSON-DIXON Mark. Under these facts and solely for the purpose of this preliminary injunction, this Court concludes that Mayson's use of the MAYSON-DIXON Mark is a classic example of blatant trademark infringement.

### b. Federal Unfair Competition & False Designation of Origin Claims

"The test for a false designation of origin/unfair competition claim is essentially the same as the test for trademark infringement." *JFJ Toys, Inc.*, 237 F. Supp. at 327 (citations omitted). Because Mason-Dixon is likely to succeed on its trademark infringement claim, it is likely to succeed on its claim that Mayson engaged in unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a).

### c. Maryland Common Law Infringement & Unfair Competition Claims

Maryland law uses the same legal framework for trademark infringement and unfair competition claims as the Lanham Act. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 n. 3 (4th Cir. 1990) ("We note that although the legal framework we here apply is derived from...the Lanham Act, Maryland law would provide the same framework."). Accordingly, Mason-Dixon is also likely to succeed on its claims under Maryland common law.

## II. Irreparable Harm

15

Where the moving party establishes trademark infringement, courts have historically applied a presumption of irreparable harm. In 2006, that presumption was called into question when the Supreme Court of the United States declined to apply the presumption of irreparable harm in a patent infringement case where one party sought a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Despite this patent infringement precedent, however, the presumption still appears to apply in the Fourth Circuit in trademark infringement cases. *See Entrepreneur Media, Inc. v. JMD Entm't Grp., LLC*, 958 F. Supp. 2d 588, 596 (D. Md. 2013) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995)) ("The Fourth Circuit has held that irreparable injury regularly follows from trademark infringement."). Accordingly, because Mason-Dixon has established trademark infringement, there is a presumption of irreparable harm.

Even without the presumption, Mason-Dixon has still established irreparable harm. Mason-Dixon alleges that Mayson's use of a nearly identical service mark threatens Mason-Dixon's reputation. Because Mayson is a partisan political firm, Mason-Dixon's reputation as independent and non-partisan will be undermined by Mayson's continued use of its trade name and mark. Such "damage to [Mason-Dixon's] reputation and goodwill may fairly be characterized as irreparable in nature." *See Entrepreneur Media, Inc.*, 958 F. Supp. 2d at 596 (D. Md. 2013) (citation and internal quotation marks omitted).

Mayson unpersuasively attempts to argue that Mason-Dixon's ten-month delay in seeking a preliminary injunction undercuts a finding of irreparable harm. Mayson cites one case from the U.S. District Court for the Southern District of New York to support this proposition. *See Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366 (S.D.N.Y. 1990). In that case, the court, without deciding the issue, commented that plaintiffs who had delayed more than two months in

seeking an injunction would be unlikely to demonstrate irreparable harm where there was evidence the plaintiffs had engaged in tactical maneuvering by timing their motion to be most injurious to the defendant. *Id.* at 368-69. Here, there is no such evidence of tactical maneuvering. Although Mason-Dixon moved for injunctive relief close to the time of the Maryland primary election, Mason-Dixon recognized in its moving papers that receiving an injunction before the election would increase the harm to Mayson because many of Mayson's clients were candidates in the election. Mason-Dixon therefore requested that this Court issue an injunction effective one day after the election so as not to impose additional harm to Mayson. ECF No. 18, p. 23. This request negates any allegation of tactical maneuvering by Mason-Dixon.

Additionally, Mason-Dixon was actively attempting to resolve the dispute during the ten months between learning of Mayson's infringement and moving for a preliminary injunction. Upon learning of the infringement, Mason-Dixon immediately filed its application to re-register the MASON-DIXON Mark. ECF No. 12-2, Coker Decl. ¶ 33. As soon as Mason-Dixon received its registration, its counsel sent a cease and desist letter to Mayson. *Id.* at ¶ 36. After sending the letter, counsel for Mayson and Mason-Dixon had an unsuccessful phone conversation, which was followed by Mayson filing suit. *Id.* at ¶ 37; ECF No 1. Mason-Dixon then filed its motion on the same day it filed its answer and counter-claim. ECF Nos. 8, 10, 12. In light of these facts, Mayson fails to show that Mason-Dixon's "delay" forecloses a finding of irreparable harm.

### III. Balance of Equities

The balance of equities tips in favor of Mason-Dixon. As discussed above, Mason-Dixon will suffer irreparable harm without a preliminary injunction. Although Mayson will also suffer

17

harm if the injunction is granted, Mayson's harm will be less severe and can be mitigated. Mayson can continue to operate its consulting services as long as it uses a different name and mark. In light of Mayson's relatively short history of operations compared to Mason-Dixon's decades of operations, the harm to Mayson's business does not outweigh the harm to Mason-Dixon's business. Additionally, one of Mayson's central arguments for denial of the injunction was the proximity of the primary election, but that election has now passed, neutralizing this argument. Finally, Mayson's disregard for Mason-Dixon's existing trademark registration when Mayson began its operations further tips the equities scale in Mason-Dixon's favor.

## IV. Public Interest

Injunctions protecting trademarks are in the public interest "because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 531 (1987) (citation and internal quotation marks omitted). A preliminary injunction protecting the MASON-DIXON Mark is therefore in the public interest. Accordingly, Mason-Dixon's motion for a preliminary injunction is granted.

## CONCLUSION

For the aforementioned reasons, defendant's motion for a preliminary injunction (ECF No. 12) is granted. Mayson is enjoined from "continued use of 'Mayson-Dixon Strategic Consulting, LLC,' MAYSON-DIXON, or any words, marks, trade names, corporate names, or domain names that are confusingly similar to MASON-DIXON, or from otherwise engaging in unfair competition against Mason-Dixon, pending the final outcome of this action." As required by Fed. R. Civ. P. 65(c), Mason-Dixon must post a bond in the amount of $10,000.00. A separate order follows.

18

August 28, 2018
Date

James K. Bredar
Chief Judge